Good morning, Your Honor. May it please the Court, my name is Jack Sands. I'm an attorney in Billings, Montana, and I represent Jose Luis Arellano-Ochoa. On March 16, 2004, Mr. Arellano was at home with his wife and children when Officer Pollack, an INS agent, and two other law enforcement officers approached his residence, his home. They came in unmarked cars, and there was nothing suspicious in the neighborhood. Counsel, why isn't there exigency that justifies an immediate entry to protect officers' safety when the fellow that they're chatting with ducks behind the door, closes the blinds, they see something happening with the blinds, and the door is shut most of the way. I mean, that's a funny response, and they do have a tip there about illegal alien, and it comes from something related to drugs. Why isn't there enough there? Also, there's kind of a shortage of furniture. It doesn't look like a regular trailer where people live. Why isn't there enough there for exigency? Because, Your Honor, first of all, there's no evidence of any crime having been committed at the time. Officer Pollack, the INS agent, indicated that he was there to do a routine alien check. There had been no evidence that there was a crime committed. Aside from crime, why not get scared the guy's going to, when he's doing something behind the blinds, is going to be shooting him? The officers came there in unmarked cars. They were not in uniform. It seems to me that the evidence that they observed of somebody ducking behind the blinds would be nothing more than somebody checking out two unidentified individuals who appeared on his doorstep. I'm not sure about that. I'm thinking, suppose that some people came up to my house, and it really was kind of a scary situation. I mean, they don't look like they have any business there. They look kind of truculent. When I was not visible for a while, it might be because I was getting my 44. Well, I suppose that's within the realm of possibility, Your Honor, but if any time somebody ducks behind the door or looks out the window to check out who's on his doorstep, if that provides exigent circumstances, then it seems to me that the constitutional protections that are attached to somebody's private home are practically gone. I mean, Officer Pollack admitted, I asked him on cross-examination if this, if Jose had ever done anything to him that was of a dangerous or abusive nature, and he said no. Where was the testimony about whether they were scared of something happening, some kind of danger? I believe that is around pages 32 to 35 of the transcript. And it is identified in my brief. Counsel, what, if anything, could the officers see before opening the screen door and standing in the threshold of the house? I have laryngitis. I'm doing my best. What, if anything, could the officers see from the porch of the defendant's house before opening the screen door? What did the officer know before opening the screen door? What did he see and what did he know before opening the door? All he saw was somebody inside the house. He could see that there was someone inside the house. When he came up the steps, Jose's girlfriend was sitting at the bottom of the steps. They indicated that they wanted to speak with a fellow named Daniel Priego, which was his alias. She yelled for Daniel. They then went up the steps. They saw him He walked, and this was a half-screen door, and so they could see through the top half of the screen into the house. But they could basically see him. It is, they couldn't see the gun. It is admitted that they never saw the gun until the door was opened, until they opened up the screen door and entered the house. So all they saw was an individual in the house. When he came around the door, he went to look. That's it. Didn't they also see that there was no furniture inside the house? You know, Your Honor, they did determine that there was no furniture inside the house, but I believe that that was after the protective search was done. What about the circumstances that led the officers to go up there, which was started off with the arrest of the man with $15,000 in cash in Wyoming? Yes, sir. And his relation that he was taking the car to Wyoming to get something done by a woman to the car, and he was going back to get the car to Priego, which was an alias for Arellano. The knowledge of all these circumstances leading up to their going to the trailer was shared by the officers, correct? I'm not sure that all of that information was imputed under the law. I understand. The other officer knew those things. So what we have here is some indication that Arellano is in the drug business. We have some indication that he's using an alias. And it's not a leap of faith to think that he might have a gun to protect his drug business. Not so? I don't think so, Your Honor. I don't think that there's any evidence whatsoever when they entered the house that Jose was using an alias. But wasn't Priego the name that was given by the courier in Wyoming, and didn't he give the address of Arellano in Billings, Montana? He gave the address in Billings, Montana. The ownership was Daniel Priego, yes. Right. But there was no indication when they entered the house that it was anybody but Daniel Priego. The officers had never heard the name Arellano before? No. Okay. Let me get back a little to the moment. Do the officers need exigency to open the door if they don't go in? Do they need exigency to open the door if they don't go in? Correct. I think they do. I mean, if they open the door for the purposes of determining what's inside. I'm thinking the sequence here was they go to the door, and they can see through the top half of the screen door something funny about the kitchen area. No furniture. And they can see something funny about the guy that lives here. Instead of standing here talking to us, telling us either what we want to know or to get lost or whatever, he runs away and closes the blinds. Then the next thing that happens is not that they enter. The next thing that happens is one of the policemen opens the screen door, and then they can see the gun on the floor. And so I'm thinking you have the additional element of the gun before they enter if opening the door doesn't count as the entry. The testimony is that when they first saw the gun, the officer behind Officer Pollack, that's Officer Cedar, was holding the door open, and Officer Pollack was standing in the threshold. So he was standing on the frame portion of the trailer house. So he was inside the frame of the trailer house. Do you need special exigency to get that far? Yes, I think you do if you're going there to investigate somebody's house. I thought he was just standing at the doorway at that point. When they saw the gun, Your Honor, the door was open. One officer was holding the door open, and the other one was inside. But all he's done is he's opened the door. I don't think anybody's stepped in yet, have they? Yes, they're on the threshold, and that's on page... Page 50 of the transcript. I think that's page 41 of the transcript. Okay. Now let me ask you something a little bit related to my previous question. Yes, sir. I know we have cultural differences in different parts of the country. Whenever I talk to a colleague who lives in suburban Los Angeles, nobody has guns but the criminals. Where I live, somewhat, well, it's not rural anymore, but a formerly rural part of Alaska, it's hard to think of a household that does not have guns. So you would just figure that person is going for his gun. Why wouldn't the officers just figure that in this part of Montana, the person who lives in that trailer is going for a gun? Well, Your Honor, I think if they would assume that, there would have to be some evidence of dangerousness. They would have observed something outside the house to make them suspicious. It would not have been a routine check to see on this fellow's alien status. There would have been some evidence of a crime, some evidence of dangerousness, some evidence of something unusual at the house, and there was none of that at the time they entered the residence. And I cited in my brief to a case that said the presence of a gun alone is not an exigent circumstance. It seemed to me that that would be more likely to be the circumstances in a rural area where guns are more frequent. I guess what I got out of page 41, the page you referred me to, was when he tucked behind the door, I was concerned about, of his activities for the safety of anyone else that was around there, and that's why I stepped up, opened the door, and as I said, I was going through the threshold area, and he reappeared. Okay, Your Honor, maybe it was page 35 that I should have referred you to. The question is, and this is on page 35, I'm sorry, Your Honor, line 6. So when Officer Cedar viewed the gun, he was holding the door open. Answer, correct. And you were somewhere inside that door. Answer, I was in the threshold area, yes. That's on page 35, not 41, actually. Thanks, sir. We've taken you over your time, but we may call on you for a moment, 30 seconds or so. Thank you, counsel. Good morning, Your Honor. My name is Jim Secora, assistant U.S. attorney in Billings, Montana. I was trial counsel in this matter. May it please the Court, Your Honor. Counsel, you do not claim that there was probable cause, but only that there was exigency, correct? That's correct. Okay. And pursuing the line of questioning that Judge Kleinfeld has begun, what is the government's position with respect to whether an exigency is required in order to open a private home's door and step across the threshold or stand in the open doorway of someone's home? Yes, ma'am, and if I may. I think Your Honor, Judge Kleinfeld had a way to talk about the sequency. I think the law is pretty clear. I think it's the factual basis which applies to the law that says the exigency, if I can follow, before I get into it. Counsel, if I can answer to my question on the legal point that the government is making. Does the government agree or disagree with the idea that some either exigency or some other requirement like probable cause is required before opening the door  I believe at that time, yes. Okay. But under the facts and circumstances and the sequencing was the word that Judge Kleinfeld used, if I could call your attention and I think it puts the argument to rest at the appellant's excerpt record on page 50, and it's Cedar, Officer Cedar. And if you can kind of visualize this, if I'm Officer Pollack and I'm in the threshold, it's kind of like the screen door and the main door is not. He's here. He's in the process of identifying himself. Cedar's behind him and looking. Prior to that, he comes. There's this shuffling. All of a sudden, increased exigency, but it's a furtive message. But Cedar testifies right here. He says, after the door came open, I was in a position, lines 11 and 12, I was in a position to see there was no gun. After he does this, he opens the door and comes back. I see a gun there when there was no gun before. I mean, it's the compendium of circumstances. Okay. But then it's even more important for me in my understanding of the case to know what exactly did the officers know before they opened the door. Did they have a basis for opening the door and looking into this man's home? They went there because they believed there was an illegal alien. Basically, that was it. Okay. Well, that's not an exigency. Which Cedar Pollack indicated in his testimony. Is that an exigency in the government's view, just that someone's an illegal alien? That's not an exigency in and of itself. Okay. All right. What else did they know? He knew at that time that a person living at this address by the name of Daniel Priego had a car that was stopped that had $15,000, which Pollack testified to as a type of courier situation, which referenced drugs and nothing else. I think that's indicative of why he brought two state drug agents with him. He didn't know exactly what he was going to come to. He didn't have probable cause to enter the home at that time, no. They talked to the young lady in the front porch who is supposed to be his wife. She calls in using the name Daniel. Things appear to be okay. He's in the threshold. But it's only when he comes, slams the door, messes with the blind, now opens the door, comes to the office. Okay. So basically, let me see if I can recap what I understand your position to be. They knew that there was potentially an illegal alien. They knew that there might be drug money, and the person went into his home, closed the door, and looked back out the window through the blinds. Is that the total of what they knew before they opened the door? If I heard everything correctly, I mean, all of those things occurred, yes. And then it's the moment of they were going to talk to him, find out what the story is. And it escalated from there with the looking at the gun. Well, the part here for me is the legal part, actually. It seems to me that there's plenty there for a Terry stop, for reasonable suspicion. Illegal alien, registered owner of the drug car, acts funny when you get to his house, houses funny, no furniture in the kitchen. Plenty there for reasonable suspicion. My problem is can you enter the house, even in the slightest degree, by opening the screen door and looking, in order to make a Terry stop? Based upon the facts in this case, I think there's no question. Well, the issue is the legal issue. Judge Kleinfeld and I are both asking for the legal proposition here, and particularly after the Supreme Court's decision in Kelo, where they're sort of reaffirming that the home is a sacred place in our constitutional scheme. And it's the legal proposition that troubles me and apparently also is the question for Judge Kleinfeld. I'm asking you to make it easy for me. Just give me the case I can hang my hat on that you think supports your position. I understand, Your Honor. I think he was instructed, though. I mean, I'm kind of answering in a negative way. What else would the officers do under those circumstances? It was not exigency. We understand it's his home. They could leave. That's what I'm saying. I mean, and I guess the question that you ask yourself, would a prudent person even consider that under the circumstances, when a guy has presumably, in their mind, just dropped a gun behind the door. I'm going to say, time out. I'm going to leave. I don't think for officer safety, for public safety, that that's a thing that you can do. But they don't know that he dropped the gun until they've opened the screen door. Page 50, line 10. The Hispanic male reappeared, opened the doorway, at which time Agent Pollack had already opened the screen door. So Agent Pollack had opened the screen door. That allowed them to see that the gun on the floor that had not been there before. Well, I think considered in that way. How could they see the gun was not there before? And I think the way counsel described the door, it's kind of an aluminum door with just maybe aluminum on the screen above it, that Cedar standing up there was able to see previously. I mean, that's what his testimony is. There was no gun there before. When he was looking, the doors partly opened when he was coming toward them. And so then only after they opened the screen door do they see the gun there. So the question is, what was their permission for opening the screen door? I think it's pretty clear when he says the Hispanic male reappeared, at which time Pollack had already opened the screen door. I could not see that there was a gun on the floor that had been there before. Right. Agent Pollack had already opened the screen door. What was the excuse for him opening the screen door? What's the exodus in circumstance? Well, I think he's in the process of identifying. He's opened the screen door. He's going to say, and that's when it's almost contemporaneous. Cedar says a gun for officer safety. They control the situation. They open the door and they handcuff him for officer safety. And I think that goes hand-in-hand with Perry, whether it's an automobile. It's a case. I mean, I don't think a policeman can open my door at home if I don't want him to. And, frankly, I don't know anyone in rural Alaska that doesn't keep a gun by the door for bears. In town, they usually just have a protection gun somewhere around the house. How does he open a door? What case can you give me that makes it this easy? And I'm talking about the – I guess I'm differentiating. I'm not trying to split hairs between the screen door. Just for purposes of identification, like you're going up to sell Girl Scout cookies, knock on the door. You're talking about going to the main door, but it's my understanding, and I think it's clear factually. It is just a screen door. That Cedar has a vision, a view of that area, without opening the screen door or not, prior to Pollack opening the screen door, where he could visually see. But now when the door reappears and opens, there's a gun there. I just factually rely upon all the exigency cases, Your Honor. Do you think that a policeman can open a screen door without any accidental circumstances or probable cause or warrant? I don't – well, I don't see why not. I guess if the main door was closed and there wasn't a doorbell, so you open the screen door to knock on the door just the way the Jehovah's Witnesses do, then it wouldn't really interfere with privacy at all. But if the main door is open and you open the screen door to get a better view, I guess it does interfere with privacy. This is how – in this – it's hard to believe our climate right now, but in the spring and summer, people leave their main doors open, have their screen doors, and I would suggest to you that Girl Scouts, police, or anyone else are not just freely authorized to open the screen door to peer in people's houses. I mean, I guess I'm troubled by the government's position in that regard. Well, I think, once again, I'm not trying to harp on this, but I think the factual pattern here is, as it builds, he comes to – the door is initially partially open. Cedar can see Pollack's there. She calls in. He's coming to the door. When he gets to the door, he kind of slams the door shut, ruffles at the blinds. And that's his right. He does – that is his right. He does not have to let people in or talk to them. I'm not – I'm not disagreeing with that, Your Honor. But when he then reopens the door and the agent was in a position – Cedar had seen that view, not because the screen door was open, but was in a position to see before he closed the door that there was no gun. It's now open. Pollack, who's the first guy, didn't observe it. He's opening and identifying himself. He didn't have a – he was just doing his normal job, identifying himself. Wanted to talk to the guy still, but it's not until it's called to his attention by Cedar that there's a gun there. This heightened situation occurs, and I believe that they have the authority right there for officer safety under all of the cases to, in fact, secure the situation, make sure that nobody is injured. And I don't think it's possible – I don't think it's appropriate for a law enforcement officer under those circumstances to just back off and leave. Can an Alaskan policeman barge into any house on the assumption that most houses have guns? I'm sorry, Your Honor. Can an Alaskan policeman barge into any house on the well-founded assumption that most houses have guns? No, absolutely not. Nor can you do it in Montana, Your Honor. If I come to the door and somebody's identifying and I'm dumping a gun behind the door, obviously that's exigent circumstances. The officer's entitled until it – maybe he's had a carry permit, maybe it fell out of his waistband under the floor. They're entitled to hold on to that situation, secure themselves properly, to find out. Maybe that's the situation. Okay, but that was not the situation. They found out at the same time when he said he was from Mexico that he was illegal. He had a gun right there. And it occurred over a matter of just a few seconds, Your Honors. Thank you. I don't know if the court has any concerns about the speedy trial issue, the second one was raised, but I would just like to – Everything in the briefs is preserved. You don't have to argue things. There were just a couple things I wanted to point out. Well, you ran out of time. All right. Thank you, Your Honor. Thank you, Counsel. Counsel, why don't you just take 30 seconds or so. No more. I would just like to make reference to two things you asked about the violent or aggressive nature of Jose. And my question was, and this is on page 42, 43, you indicated that there was a slight struggle. I mean, he didn't act violent or aggressive towards you in any way, did he? Answer, towards me, question, yes. Answer, no. And then the question about the gun, and this is on the bottom of page 31 and over on page 32. And neither you nor Officer Cedar would have ever seen the gun if you hadn't opened the door. Isn't that true? Answer, if I had not opened the screen door, that's correct. What page is that? That is on the bottom of page 31, top of page 32, Your Honor. Thank you, Counsel. Thank you, sir. Thank you. United States v. Ariana Ochoa is submitted.
judges: Kleinfeld, Graber, Bea